# In the
# United States Court of Appeals
## for the Eighth Circuit

BRADLEY B. BAUMANN, NANCY R. BAUMANN,
DONNA J. COSTLEY, individually, and as co-special administrators
of the ESTATES OF CHRISTOPHER DOUGLAS SCHMIDT,
DIANA RUTH SCHMIDT, SAMUEL DONOVAN SCHMIDT,
and CONNOR BRADLEY SCHMIDT,

*Plaintiffs-Appellants,*

v.

VLADIMIR ZHUKOV, SWIFT-TRUCK LINES, LTD., MTR EXPRESS,

*Defendants-Appellees,*

LONG HAUL TRUCKING, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the District of Nebraska, No. 8:12-cv-00383-FG3.
The Honorable **F. A. Gossett**, Judge Presiding.

## APPELLANTS' BRIEF

JAMES H. CHALAT
CHALAT HATTEN KOUPAL & BANKER PC
1900 Grant Street, Suite 1050
Denver, Colorado 80203
(303) 861-1042

*Attorney for Plaintiffs-Appellants*

 
Appellate Case: 14-2981　　Page: 1　　Date Filed: 10/17/2014 Entry ID: 4207311

# I. SUMMARY OF THE CASE

The next-of-kin and the estates of the Schmidt family sued two truck drivers and three federally regulated motor carriers. Plaintiffs alleged that on Sunday morning September 9, 2012 the defendants' *combined* negligence caused *related* collisions on rural Interstate-80, near Potter, Nebraska.

At 4:38 AM, Zhukov's truck was negligently stalled in the WB right lane. Long Haul's driver was inattentive. He rear-ended Zhukov. Fire and wreckage blocked WB I-80. At 5:14 AM, and .86 miles east, the Schmidts were trapped at a full stop behind the blocked WB traffic. Slezak was driving on WB I-80 at 75 mph.  He was inattentive and fatigued; he rear-ended the Schmidts.  The impacts and fires caused Schmidts' deaths.

On summary judgment the district court dismissed plaintiffs' claims against Zhukov and Long Haul holding that Slezak was an intervening cause. However, plaintiffs' had shown that Slezak' s conduct was foreseeable, especially given defendants' own negligence; and Slezak's conduct was also well within the recognized risk of congested traffic according to statistics regarding fatality trucking accidents.

For this single-issue appeal, argument of fifteen minutes is sufficient.

Appellate Case: 14-2981    Page: 2    Date Filed: 10/17/2014 Entry ID: 4207311

## II.    TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE CASE ..........................................................................i

II.    TABLE OF CONTENTS ............................................................................ ii

III.    TABLE OF AUTHORITIES ...................................................................... vi

IV.    JURISDICTIONAL STATEMENT ............................................................1

V.    STATEMENT OF ISSUES PRESENTED FOR REVIEW .........................2

    A.    AS TO VLADIMIR ZHUKOV, SWIFT-TRUCK LINES, LTD. AND MTR EXPRESS, INC., (THE "ZHUKOV DEFENDANTS") ....................................................................2

    B.    AS TO LONG HAUL TRUCKING, INC., ("LONG HAUL") ....................................................................................4

VI.    STATEMENT OF THE CASE ....................................................................5

    A.    FACTS ............................................................................................5

        1.    *Introduction* ......................................................................5

            a.    The Zhukov Defendants .................................5

            b.    Long Haul Trucking, Inc. .............................8

        2.    *The Primary Collision Between Zhukov and Long Haul* ...............................................................................10

            a.    Zhukov's breakdown and failure to get his truck out of the right-hand lane created a hazard to oncoming traffic .........................10

            b.    Gary Mayes sees the Zhukov truck stopped in the travel lane and calls 911 ...................13

Appellate Case: 14-2981    Page: 3    Date Filed: 10/17/2014 Entry ID: 4207311

           c.     Sheriff's deputy Goodrich responds to the Mayes 911 call and the Zhukov/Long Haul primary collision blocks WB I-80 .............................16

     3.    *The Secondary Collision Between The Schmidts and Slezak*........................................................................19

           a.     The Schmidt family ....................................19

           b.     Josef Slezak .................................................19

           c.     The secondary collision................................20

  B.    THERE WAS SUFFICIENT EVIDENCE FOR A JURY TO FIND THAT THE RISK OF A SECONDARY COLLISION WAS FORESEEABLE TO THESE DEFENDANTS ...................................................................22

     1.    *The Zhukov Defendants Appreciated The Risk That Blocking The Roadway Presents A Danger Of A Secondary Rear-Striking Collision* ...........................22

     2.    *Long Haul Also Had Specific Knowledge That Blocking A Roadway Creates A Hazard Of A Rear-Striking Collision* ....................................................23

     3.    *Plaintiffs' Experts Provided A Statistical Analysis Demonstrating That Follow-Along Collisions Are Not Only Foreseeable, But Are Among The Most Common Causes Of Truck Related Fatalities* ...........................25

  C.    PROCEDURAL HISTORY ................................................28

  D.    RULING PRESENTED FOR REVIEW.............................29

VII.  SUMMARY OF THE ARGUMENT ........................................30

VIII.  ARGUMENT ...............................................................................31

  A.    THE STANDARD OF REVIEW IS *DE NOVO* .............................31

Appellate Case: 14-2981   Page: 4   Date Filed: 10/17/2014 Entry ID: 4207311

B. THE TRIAL COURT INCORRECTLY DECIDED THAT THE DEFENDANTS' ACTIONS, AS A MATTER OF LAW, DID NOT PROXIMATELY CAUSE THE DEATHS OF THE SCHMIDT FAMILY ........................................33

 1. *To Properly Analyze The Claims Made By The Plaintiffs, The Court Must Consider The Foreseeability Of The Harms Suffered By The Schmidt Family As A Result Of The Actions Of The Defendants*...............................33

 2. *Whether or not the harms suffered by the Schmidt Family were foreseeable to these Defendants is a question for the jury*..................................................35

 3. *The Trial Court Ignored The Facts Which Establish That The Harms Suffered By The Schmidt Family Were Proximately Caused By The Negligence Of The Defendants* ................................................................39

  a. Because the risk of a rear-striking collision was precisely the hazard caused by these defendants' negligence, they should be liable for the consequences.........................................39

  b. Expert testimony established that traffic flow interruptions including prior collisions is a leading cause of serious/fatal crashes such as the ones which combined to kill the Schmidt Family ............................................44

  c. The trial court erred by not following this Court's decision in *Heatherly*......................................47

 4. *Recent decisions from the Supreme Court of Nebraska establish that when the harm is within the scope of the risks created by the negligent actions of a person proximate cause is a decision for the jury*.................................50

iv

5. *The Blind Intersection Cases, Particularly* Latzel v. Bartek, *Are Inapposite* ............................................................58

IX. CONCLUSION ............................................................................63

Appellate Case: 14-2981     Page: 6     Date Filed: 10/17/2014 Entry ID: 4207311

# III. TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.W. v. Lancaster Cty., Sch. Dist. 0001,*
   280 Neb. 205, 784 N.W.2d 907 (2010) ...............................................*passim*

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ...................................................................................32

*Brown v. Neb. Pub. Power Dist.,*
   209 Neb. 61, 306 N.W.2d 167 (1981) .......................................................49

*Dancy v. Hyster Co.,*
   127 F.3d 649 (8th Cir. 1997)......................................................................31

*Delaware, By and Through Delaware v. Valls,*
   226 Neb. 140, 409 N.W.2d 621 (Neb., 1987).....................................58, 61

*Deviney v. Union Pacific R. Co.,*
   280 Neb. 450, 786 N.W.2d 902 (2010) ...............................................52, 64

*Fuhrman v. State,*
   265 Neb. 176, 655 N.W.2d 866 (Neb., January 24, 2003)......31, 54, 55, 56

*Get Away Club, Inc. v. Coleman,*
   969 F.2d 664 (8th Cir. 1992).....................................................................32

*Heatherly v. Alexander,*
   421 F.3d 638 (8th Cir. 2005)...............................................................*passim*

*Johnson v. Metropolitan Utilities District,*
   176 Neb. 276, 125 N.W.2d 708 (1964) ...................................................3, 5

*Latzel v. Bartek,*
   288 Neb. 1, 846 N.W.2d 153 (2014) ....................................................*passim*

*Martensen v. Rejda Bros., Inc.,*
   283 Neb. 279, 808 N.W.2d 855 (2012) ...............................................54, 64

vi

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ....................................................................32

*Reed v. State*,
    2014 WL 2581349 (Neb. App. June 10, 2014)............................35

*Riggs v. Nickel*,
    281 Neb. 249, 796 N.W.2d 181 (2011) ..................................53, 64

*Sacco v. Carothers*,
    253 Neb. 9, 567 N.W.2d 299 (1997) .............................34, 44, 56

*Tyler v. Harper*,
    744 F.2d 653 (8th Cir. 1984), *cert. denied*, 470 U.S. 1057 (1985)..............32

*Wilken v. City of Lexington*,
    16 Neb. App. 817, 754 N.W.2d 616 (2008) ................................57

*Willet v. County of Lancaster*,
    271 Neb. 570, 713 N.W.2d 483 (Neb., 2006)........................58, 60

*Williams v. City of St. Louis*,
    783 F.2d 114 (8th Cir. 1986)......................................................32

*Zeller v. Howard County*,
    227 Neb. 667, 419 N.W.2d 654 (Neb., 1988)........................58, 60

Appellate Case: 14-2981   Page: 8   Date Filed: 10/17/2014 Entry ID: 4207311

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 1332(a)(1) ...................................................................... 1

49 C.F.R. 391.11(b)(2) ...................................................................... 7

Fed. R. App. P. 4(a)(1)(A) ............................................................... 2

Fed. R. Civ. P. 56(c) ....................................................................... 32

Federal Motor Carrier Safety Act Regulations:
    FMCSA §§ 393.95, 392.22 ......................................................... 3, 5
    FMCSA §§ 391.11(2), 398.3(c)(4) ............................................ 3, 5

Neb. Rev. Stat. § 60–6,164(2) (2007) ....................................... 3, 5

Restatement (Third) of Torts ....................................................... 38

Restatement (Third) of Torts, § 7 ............................................... 37

Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010)
    (comment j) ................................................................................ 35

Restatement (Third) of Torts, § 34 ....................................... 58, 64

Moore, J. E., G. Giuliano, and S. Cho, "Secondary Accident Rates on
    Los Angeles Freeways," 41 Journal of Transportation
    Engineering, Vol. 130, No. 3, 2004 ........................................... 27

Raub, R.A., "Occurrence of Secondary Crashes on Urban Arterial
    Roadways," Transportation Research Record 1581, 1997 .................. 27

Raub, R.A., "Secondary crashes: An Important Component of
    Roadway Incident Management" Transportation Quarterly,
    Vol. 51, No. 3, 1997 .................................................................... 27

Appellate Case: 14-2981    Page: 9    Date Filed: 10/17/2014    Entry ID: 4207311

# IV. JURISDICTIONAL STATEMENT

This is a diversity case. The district court had subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). Because the case entails death claims for five lives, including that of the unborn child, the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs. The case is between citizens of different states. The plaintiffs – Mr. & Mrs. Baumann, Ms. Costley and the Estates of Christopher, Diana, Samuel and Connor Schmidt – are citizens of California. Zhukov is a citizen of either Wisconsin, Illinois or both; his employer, MTR Express, Inc., and the Zhukov truck owner, Swift-Truck Lines, LLC, are citizens of Illinois. Long Haul Trucking, Inc. is a citizen of Minnesota.

Jurisdiction in this Court is based upon 28 U.S.C. § 1291. On May 21, 2014 the trial court granted Motions for Summary Judgment which were filed by the Zhukov, Swift-Truck, and MTR (the "Zhukov Defendants") and Long Haul. Plaintiffs' claims against the Zhukov Defendants and Long Haul were dismissed.

1

On August 5, 2014, Mr. & Mrs. Baumann, Ms. Costley and the Estates completed a settlement with Slezak and AKI Trucking, Inc. On August 6, 2014, the district court entered a final judgment dismissing Slezak and AKI. The judgment disposed of all the remaining parties' claims. The Baumanns, Costley and the Estates filed their notice of appeal on August 23, 2014. This appeal is therefore timely pursuant to Fed. R. App. P. 4(a)(1)(A).

## V.     STATEMENT OF ISSUES PRESENTED FOR REVIEW

### A.  AS TO VLADIMIR ZHUKOV, SWIFT-TRUCK LINES, LTD. AND MTR EXPRESS, INC., (THE "ZHUKOV DEFENDANTS")

An "efficient intervening cause" severs the causal connection between the claimed injury and the conduct of the defendants when the third party's negligence could not have been anticipated by the defendants.

Zhukov's own testimony, along with lay witnesses' testimony, law enforcement testimony, and expert affidavits showed that the Zhukov Defendants knew or should have known that when a tractor-trailer collision blocks the interstate it is reasonable to anticipate that another tractor-trailer driver would negligently collide into the stalled traffic

2

behind the primary collision scene. Nonetheless, the district court found that as a matter of law the negligence of co-defendant Slezak could not have been anticipated by the Zhukov Defendants.

Was it error for the trial court to take away from the jury the factual determination of whether the Zhukov Defendants, as professional tractor-trailer operators, and particularly in view of their own negligent conduct, could have anticipated the negligence of Josef Slezak in the secondary collision which killed the Schmidt Family?

**Apposite cases:**

*Heatherly v. Alexander*, 421 F.3d 638 (8th Cir. 2005)
*Johnson v. Metropolitan Utilities District*, 176 Neb. 276, 125 N.W.2d 708 (1964)
*Latzel v. Bartek*, No. S-13-053, 2014 WL 1724349 (Neb. May 2, 2014)
*A.W. v. Lancaster Cty., Sch. Dist. 0001*, 280 Neb. 205, 784 N.W. 2d 907 (2010).

**Statutory provisions:**

Neb. Rev. Stat. § 60–6,164(2) (2007)

Federal Motor Carrier Safety Act Regulations:
FMCSA §§ 393.95, 392.22
FMCSA §§ 391.11(2), 398.3(c)(4)

3

## B.   AS TO LONG HAUL TRUCKING, INC.,  ("LONG HAUL")

Whether the negligence of co-defendant Slezak severed the chain of causation is measured by whether Long Haul, not an abstract reasonable person, could anticipate Slezak's negligent driving.

Long Haul is an owner-operator of tractor-trailer trucks. Through the testimony of its employees, Long Haul evinced a high level of sophistication concerning the risks, hazards, and causes of highway accidents. Long Haul's safety officer testified to his familiarity with the risk of follow-along or "secondary collisions," even to the extent of acknowledging the primary safety study relied upon by plaintiffs' truck safety expert. Long Haul's driver, who was on probation for prior safety violations, was either inattentive or asleep at the wheel as he crashed into the stalled Zhukov tractor-trailer.

Was it an error for the trial court to find as a matter of law that Long Haul could not have anticipated Slezak's negligence, particularly when it was practically identical to the negligence committed by its own driver?

4

**Apposite cases:**

*Heatherly v. Alexander*, 421 F.3d 638 (8th Cir. 2005)
*Johnson v. Metropolitan Utilities District*, 176 Neb. 276, 125 N.W.2d 708
(1964)
*Latzel v. Bartek*, No. S-13-053, 2014 WL 1724349 (Neb. May 2, 2014)

**Statutory provisions:**

Neb. Rev. Stat. § 60–6,164(2) (2007)

Federal Motor Carrier Safety Act Regulations:
FMCSA §§ 393.95, 392.22
FMCSA §§ 391.11(2), 398.3(c)(4)

## VI.  STATEMENT OF THE CASE

A.  FACTS

    *1.  Introduction*

        a.  The Zhukov Defendants

The Zhukov Defendants were experienced, knowledgeable, and

sophisticated in matters of commercial motor vehicle operation and

highway safety. Vladimir Zhukov held a commercial driver's license and

was employed by Swift-Truck Lines, Ltd. On September 9, 2012, he was

driving a 2003 Volvo tractor semi-trailer rig owned by Swift. Zhukov was

westbound on I-80. The Volvo rig was leased by Swift to MTR Express, Inc.

5

MTR was an authorized commercial motor carrier with a certificate of authority issued by the Department of Transportation. J.A. 0073-0093; J.A.- 0095-0109.

Volodymyr Didenko was the president of Swift. J.A. 0884. Didenko held a CDL issued by Illinois. Before coming to the United States, Didenko had driven a commercial "straight truck" in the Ukraine. Didenko helped manage the trucks for MTR. J.A. 0888-0889. Didenko knew that Zhukov's English was very poor. J.A. 0892. He and Zhukov would converse in Russian. *Id.*

Didenko testified that all of Swift's vehicles ran under the DOT authority of MTR. J.A. 0886-0899. MTR was owned by Vladislav Kriatchko. J.A. 0884. Kriatchko was familiar with the Federal Motor Carrier website and understands that he can check it to "see what our score is." J.A. 0918. The Carrier Snapshot, referred to as a score-card by Kriatchko during his deposition, contains MTR's record at the relevant time for violations and vehicle maintenance violations. Theseincluded five "fatigued driving violations," J.A. 0947; six maintenance violations for "brake tubing and

6

hose adequacy," J.A. 0953-0955; and two violations for failing to secure brake hosing/tubing. These violations pre-dated September 9, 2012. *Id.* MTR's violation record is relevant on the issue of whether it is reasonable that MTR anticipate that other drivers are driving while fatigued, in violation of hours of service requirements, or of other FMCSA regulations.

From his experience, MTR Operations Manager and Dispatcher Vojtech Gorcsos, acknowledged that a blocked roadway presented a risk of a rear-striking collision, and that this risk was such that even putting on the four-ways is not sufficient. J.A. 0994-0995. He described Zhukov's English as "very very poor." J.A. 0980. More to the point, Gorcsos agreed that Zhukov "could not read or speak the English language sufficiently to respond to official inquiry." J.A. -0987.

Under the FMCSA regulations, Zhukov was arguably unqualified to hold a CDL because he did not speak English well enough to communicate with a law enforcement officer. J.A. 0568, 0957, Addendum at 20; 49 CFR 391.11(b)(2). This is the baseline criteria under the FMCSA regulations for a driver to qualify to hold a CDL, and as you will see, Zhukov's inability to

Appellate Case: 14-2981    Page: 16    Date Filed: 10/17/2014 Entry ID: 4207311

communicate in English made it impossible for him to have called 911 to warn and seek assistance for the "danger" in which he had placed himself. *Id.*

   b.   *Long Haul Trucking, Inc.*

Long Haul Trucking, Inc. is an authorized commercial motor carrier with a certificate of authority issued by the DOT. It is based in Albertville, Minnesota. J.A. 1118-20. Long Haul employed Keith Johnson as a driver. As of September 9, 2012, Mr. Johnson had been on probation with Long Haul for having received three moving violations in three years while driving for Long Haul. J.A. 0443 ("probation letter" May 23, 2012) J.A. 0449 ("friendly reminder" letter June 15, 2011). On May 24, 2012, Mr. Mark Theis, the Safety Director for Long Haul, had signed off on a "Written Final Warning" addressed to Mr. Johnson. J.A. 0444. This indicated that Johnson "does not adequately meet satisfactory safe driving performance." J.A. 0376-0377; 0443-0444.

Despite this corporate finding that Johnson's driving did not "meet satisfactory safe driving performance" standards, Long Haul continued to

8

employ Johnson. On September 9, 2012, he was driving a 2011 Peterbilt tractor and semi-trailer owned and operated by Long Haul. Johnson was westbound on I-80. He was fifteen to twenty-five minutes behind Zhukov.

As the Safety Director for Long Haul, Mark Theis was certified through a 40-hour classroom program of the National American Trucking Motor Institution. He carried a Commercial Driver's License (CDL) and was familiar with the Department of Transportation and Federal Motor Carrier Safety Administration (FMCSA) regulations. *Id.*

Theis was also familiar with the core FMCSA truck safety and fatality accident studies: LTCCS and TIFA. J.A. 0369, 0381, Addendum at 12. The Large Truck Crash Causation Study (LTCCS) was undertaken jointly by the Federal Motor Carrier Safety Administration (FMCSA) and the National Highway Traffic Safety Administration (NHTSA). J.A. 0742. Mr. Theis acknowledged the Trucks Involved in Fatal Accidents study ("TIFA").[1] These studies are widely published and are derived from national statistics

---

[1] FACTBOOK, 2008 Center for National Truck and Bus Statistics, University of Michigan Transportation Research Institute, 2901 Baxter Road • Ann Arbor, Michigan 48109-2150

9

submitted by agencies and licensed carriers as part of their license requirements. J.A. 0368-0369, Addendum at 12. From experience, training, and review of the studies, Mr. Theis was familiar with the causes of large truck accidents, including the frequency of secondary accidents related to traffic congestion from a previous accident. J.A. 0369, 0371, Addendum at 12. Mr. Theis and the Long Haul corporate Safety Statement referred to some of these situations, including traffic congestion and unexpected traffic stoppage as "accident traps." J.A. 0367.

        2.    *The Primary Collision Between Zhukov and Long Haul*

            a.    *Zhukov's breakdown and failure to get his truck out of the right-hand lane created a hazard to oncoming traffic.*

The collisions began when Zhukov's truck lost air pressure in its braking system at some time before 4:20 AM on September 9, 2012. Zhukov heard a noise "like a thum[p]" and then the sound of escaping air. J.A. 0552. Zhukov testified that his air pressure gauge began to fall. J.A. 0552. A warning buzzer alerted. J.A. 0896. Zhukov's brakes began to apply automatically on the first drive axle of the tractor and the front axle or axles

10

of the trailer when his pressure fell to below 35 psi. J.A. 768; 1204-1205.[2]

According to Zhukov: "the car stopped itself because the brakes started automatically to stop the truck."  J.A. 0552.

Zhukov testified that he then tried to pull off the travel lane onto the shoulder.

> Q. Why did you need to get on the shoulder of the road?
> A. Because I knew that the air will just – I will completely lose the air, the brakes will lock, and I will be standing in the traveling lane.
> Q. And that would create a hazard?
> A. Of course.
> Q. To following vehicles.
> A. Yes of course.
> J.A. 0554.

The plaintiffs' and Long Haul's expert witnesses both concluded that Zhukov would have had enough to bring his entire rig *fully off* the

---

[2] When a commercial motor vehicle's air-brake system loses air, the vehicle's brakes apply by virtue of the loaded springs which are kept retracted by the maintenance of air pressure. The springs, no longer held open by the force of the pressurized air system, begin to close bringing the truck to a stop. J.A. 0895. This universal design is known in the industry as "failing to safety." A discussion of the airbrake dynamic is found in each of the parties' experts' reports. Plaintiffs' expert, Mr. Railsback, J.A. 0764 et seq. Defendant Long Haul's expert Mr. Goebelbecker, P.E., J.A. 1178, 1182-1183.  Zhukov Defendants' experts Dr. Sokol,  Mr. Sokol, J.A. 1189, 1203-1204.

Appellate Case: 14-2981     Page: 20     Date Filed: 10/17/2014 Entry ID: 4207311

interstate and completely onto the right hand shoulder. Mr. Railsback's

under oath opinion was:

> Analysis of the time and distance associated with the reported braking system failure shows that Mr. Zhukov, even with emergency brakes slowing the tractor-trailer down, would have had enough distance to get the entire tractor and trailer off the highway and into the shoulder of the road. Had Mr. Zhukov moved his entire tractor-trailer off the roadway, the right lane of travel on I-80 westbound would have been clear for the truck driven by Mr. Johnson to pass by Mr. Zhukov's Volvo and the collision would not have occurred. The queue of vehicles would not have developed on the roadway, and therefore, the second collision involving the Schmidt's… and Mr. Slezak would not have occurred.
> J.A. 0762-0783, 769.

Mr. Goebelbecker, the engineer for Long Haul, concluded that Mr.

Zhukov would have had between 21-44 seconds to steer his vehicle

completely off the highway. J.A. 1186-1187. Even the Sokol report on behalf

of Zhukov concluded that *after* the spring brakes began to apply, Zhukov

would have had "between 9.0 seconds to 13.5 seconds before he came to a

complete stop." J.A. 1207, 1211.  *Cf.* Railsback summary of expert opinions

J.A. 0786-0787.

12

Railsback also concluded that Zhukov was inadequately trained or informed of the operation of the Volvo controls, perhaps owing to his limited English comprehension. Railsback concluded that once fully stopped by the spring-brakes, Zhukov could have over-powered the locked spring-brakes and driven fully off the right lane and onto the right shoulder. J.A. 0770, 0787.

Nonetheless, Zhukov came to a dead stop fully blocking the right lane of westbound I-80 near the Potter exit with his 4-way hazard lights flashing. J.A. 0285, 0553.

> b. Gary Mayes sees the Zhukov truck stopped in the travel lane and calls 911.

Gary Mayes was a professional truck driver with 34-years' experience driving tractor semi-trailers. J.A. 0523-0524. Mayes was driving his 2003 Peterbilt with a semi-trailer westbound on I-80 when he first saw Zhukov's disabled truck by virtue of its 4-way hazard lights. It was about 4:15 AM. The lay of the highway initially made Zhukov look to be on the shoulder but as Mayes got closer and slowed down, he saw that Zhukov was actually blocking the right-hand lane J.A. 526-527, 0825 (photo marked

13

up by Mayes). Mayes radioed on his CB a warning to other westbound traffic: "Hey, you want to get over in the left lane. This guy is parked in the road." J.A. 0528, Addendum at 18. As Mayes passed the truck he saw that the driver was out of the cab and appeared to be putting out reflective triangles.

Mayes decided that Zhukov's stalled rig still presented enough of a roadway hazard to oncoming westbound traffic to warrant a call to 911. Mr. Mayes's 911 call was logged and recorded by Nebraska State Patrol (NSP) at 4:20 AM. J.A. 0528-0529, Addendum at 18. "Not even five minutes after I went past him I made that call to 911." *Id.*

Mayes's 911 call foreshadows the chain of tragic events which was about to unwind on westbound I-80:

> JANA: State patrol communications. This is Jana.
> MR. MAYS: Jana, this is Gary with -- Trucking. I just passed a truck on Interstate 80 about the 38-and-a-half, 39 mile marker. He's sitting dead still in the right lane.
> JANA: Okay.
> MR. MAYS: (Inaudible).
> JANA: In the eastbound or westbound?
> MR. MAYS: He's on the westbound side.
> JANA: Westbound? Okay.

14

MR. MAYS:  Yeah. I'm afraid somebody is going to rear end him this time of morning.

JANA:  Okay. And he's just stopped in the traffic lane?

MR. MAYS:  He's stopped in the traffic lane. Looks like some young kid was trying to get some triangles out or something. But he's right in the right lane.

JANA:  Okay.

MR. MAYS:  He ain't off -- he's not off the interstate.

JANA:  Not off at all. Okay.

J.A. 0528-0529, Addendum at 18.

The time was 4:20 AM.  J.A.0604.

As Mayes accelerated away from the scene, Zhukov placed his three reflective warning triangles behind his stalled rig. Unfortunately, Zhukov placed the triangles improperly, so that they would guide an oncoming driver not into the left lane but rather *into the right rear* of Zhukov's semi-trailer. After putting out the triangles Zhukov returned to his cab and placed a 10-minute call, not to 911, but to Didenko. J.A. 0555, 0958-0959. The time was 4:24 AM.

15

Appellate Case: 14-2981     Page: 24     Date Filed: 10/17/2014 Entry ID: 4207311

c.    Sheriff's deputy Goodrich responds to the Mayes
        911 call and the Zhukov/Long Haul primary
        collision blocks WB I-80.

A minute before Zhukov made his call to Didenko, at 4:23 AM,

Cheyenne County Sheriff's Office ("CCSO") Deputy Zachary Goodrich had

been dispatched from Sidney, Nebraska on a "motorist assist" in response

to the 911 call by Mayes. J.A. 0604, 0608, 1032. Goodrich drove at high

speed west on I-80 toward Zhukov's stalled truck.

Before Deputy Goodrich got to Zhukov's truck, the westbound

tractor semi-trailer driven by Keith Johnson on behalf of Long Haul

crashed into the back of Zhukov's semi-trailer. The impact caused both

vehicles to explode, catch fire, burn, and strew wreckage across westbound

I-80, blocking it. J.A.1033. The time of this primary collision was between

4:34 AM and 4:38 AM based upon the dispatch logs of the CCSO and the

Nebraska State Patrol ("NSP"). J.A. 0597, 0604, 0608. Goodrich radioed that

he was on the scene at 4:40 AM.

NSP Accident Reconstruction expert, Tpr. Travis Wallace, testified

that Zhukov caused the collision by parking his tractor semi-trailer in the

16

westbound right-hand lane and by improperly placing the reflective warning triangles. J.A.0521, 0642-0645, 0719, 0724-0736.

Photos and scaled diagrams of Zhukov's triangle placement were presented in Plaintiffs' expert engineering reconstruction report prepared by Ben Railsback, P.E. J.A., 0764-790, at 0777-0778 (photos) and 0779 (diagrams).

On the other hand, there was evidence that Long Haul's driver, Keith Johnson, was also negligent and a cause of the primary collision. CCSO Deputy Zach Goodrich testified there were no pre-impact skid marks left by the Long Haul tractor semi-trailer as it collided into the rear of Zhukov's trailer. J.A. 1042. Goodrich had reported: "This Deputy did not see any skid marks that would indicate that brakes were used." J.A. 1035, 1322.

Goodrich's post-incident report was consistent with the eye-witness testimony from Larry Wallace. Mr. Wallace was driving his tractor semi-trailer westbound on I-80 and was with a group of about four trucks "which the driver that was involved in the accident, the deceased [Keith

17

Johnson, Long Haul] was ahead of those trucks because he had gotten on in Sidney." J.A. 0471. Wallace then testified:

> [Long Haul's truck] was the one that was involved in the accident…I watch his vehicle and he doesn't attempt to merge or even attempt to slow down…slightly starts veering to the right towards the right shoulder… as it is happening, I'm seeing the truck and the trailer of the stalled [Zhukov] truck ultimately go into pieces and slide across the interstate, shutting it down. J.A. 0473, Addendum at 16.

Mr. Wallace identified photographs of the location and the wreckage of the Zhukov/Long Haul collision. J.A. 0485, 0519-0520. Addendum at 17.[3] Zhukov also identified bystander photographs of the burning wreckage of the primary collision. J.A. 0519.

Zhukov's engineering experts concluded that the Zhukov tractor-trailer was visible "for a sufficient distance to allow Mr. Johnson to recognize the traffic conditions ahead and take appropriate actions to avoid impacting the Zhukov trailer…Mr. Johnson's failure to appropriately respond in a timely manner … demonstrates that he was not attentive." J.A. 1210-1211.

---

[3] Camera was set on Pacific Time. Western Nebraska was on Mountain Time.

18

From this evidence, a jury could conclude that the Zhukov/Long Haul collision which shut down the interstate was the result of the *combined* negligence of Zhukov and Long Haul.

> 3. *The Secondary Collision Between The Schmidts and Slezak*

> a. The Schmidt family

Christopher Schmidt was 30-years old; Diana Schmidt was 28. J.A. 1082-1083. Samuel was 3, and Connor was 2-years old. Diana was seven months pregnant. J.A. 1084-1086. Mr. & Mrs. Schmidt were traveling in two cars. Mrs. Schmidt was driving the 2007 Toyota Corolla. The boys traveled in car seats in the back seat of their mother's car. J.A. 0662. Mr. Schmidt was driving his 2010 Mustang. J.A. 0657- 0675; 1146-1150, Addendum at 23.

Diana Schmidt had stopped her 2007 Corolla at the end of the queue as the traffic stoppage from the Zhukov/Long Haul collision moved eastward. Christopher Schmidt stopped the Mustang behind the Corolla.

> b. Josef Slezak

Josef Slezak held a commercial driver's license and was employed by AKI Trucking, Inc. J.A. 0634, 0657-0666. Slezak is a citizen of the Czech

19

Republic and spoke almost no English. J.A. 0587. On September 9, 2012, he was driving a 2003 Kenworth tractor semi-trailer rig westbound on I-80. Mr. Slezak had driven in excess of his permitted hours of service as he approached the traffic stopping behind the Zhukov-Long Haul collision. Slezak failed to slow or stop and collided at highway speed into the Schmidts' fully stopped passenger cars. J.A. 0817.

        c.     The secondary collision.

The impact of Slezak's Kenworth tractor semi-trailer into the rear of Mr. Schmidt's Mustang propelled it into Mrs. Schmidt's Corolla. The Corolla was in turn propelled underneath the semi-trailer parked ahead of her. All four vehicles – the Kenworth tractor semi-trailer, the Mustang, the Corolla, and the semi-trailer under which the Corolla had been forced – caught fire. The Schmidt family perished.

The secondary collisions which killed the Schmidt family occurred at 5:14 AM, only 36 minutes after the primary collision between Zhukov and Long Haul. The location of the secondary collision was on westbound I-80 just .86 mile east of the primary collision. J.A. 0634.

20

Truck driver Larry Wallace, who remained at the scene of the Zhukov/Long Haul collision identified photos taken from the location of the Zhukov/Long Haul collision. The photos show the smoke from the Schmidt/Slezak collision and give one a view of the proximity of the collisions. J.A. 0485-0486; 0520 (photos), Addendum at 17.

Cheyenne County Chief Deputy Sheriff Fred Wiedeburg was dispatched from Sidney at 4:45 AM and was *en route* to the primary collision when the reports came into dispatch of the secondary collision. J.A. 1146-1150, Addendum at 23. No law enforcement was attending or controlling the back of the traffic queue as the stoppage moved east. Likewise, Sidney Volunteer Fire Department Chief Keith Stone and two fire trucks were responding to the first fire. They actually passed the rear of the line a few moments before the second collision. J.A. 806. It is likely that Stone passed Slezak and observed him "drift" across the center line before passing him. J.A. 805, 807. Stone, upon receiving the call about a "second one," looked back and saw the "fireball" from the Slezak and Schmidts' burning vehicles. Stone turned around to return to the Schmidt/Slezak

Appellate Case: 14-2981   Page: 30   Date Filed: 10/17/2014 Entry ID: 4207311

scene. J.A. 809. Stone described a hill between the two collision sites, and the terrain which separated the east and westbound roadways, as "rough and steep." J.A. 0807-808.

Tpr. Wallace testified that Slezak (like Johnson) left no braking skid marks before impacting the Mustang. J.A. 0641, Addendum at 21. Tpr. Wallace testified: "My opinion is that Mr. Slezak was either inattentive, distracted or in some other manner not driving with due caution going down the highway as to avoid striking the other vehicles." *Id*.

B.  THERE WAS SUFFICIENT EVIDENCE FOR A JURY TO FIND THAT THE RISK OF A SECONDARY COLLISION WAS FORESEEABLE TO THESE DEFENDANTS.

1.  *The Zhukov Defendants Appreciated The Risk That Blocking The Roadway Presents A Danger Of A Secondary Rear-Striking Collision.*

Zhukov was well aware of the risk that his disabled truck in the driving or "travel lane" presented to oncoming traffic. Zhukov knew that "standing in the travel lane" would "of course" be a hazard to following vehicles. J.A. 0553. Asked how he would describe his situation to emergency personnel, he responded, in broken English, "55 mile,

22

dunger(sic)...Dunger, truck." J.A. 0568, Addendum at 20. Zhukov did not have authority to call for a tow, he would have had to call Didenko first because Didenko would have to pay for it. J.A. 0894.

Kriatchko hired, trained and qualified Mr. Zhukov as a driver permitted to drive under the MTR authority. This entailed confirming Mr. Zhukov's commercial driver's license purportedly furnishing safety information and training, and checking Mr. Zhukov's ability to handle a tractor semi-trailer rig. J.A. 0915-0918. Mr. Kriatchko was sophisticated with regard to record keeping. J.A. 0918, 0920-0930. In addition to his testimony of, at least passing knowledge of the FMCSA Safety Snapshot, Kriatchko testified that an accident which blocks the highway creates a hazard: … "It's a big threat . . . it's always a big danger for the drivers." J.A. 0926

      2.    *Long Haul Also Had Specific Knowledge That Blocking A Roadway Creates A Hazard Of A Rear-Striking Collision*

As previously noted, Mr. Mark Theis was familiar with the TIFA and LTCCS studies. He believed that the studies were accurate. J.A. 0368, 0371, Addendum at 12. These studies were relied upon as well by plaintiffs'

23

truck safety statistician, Ms. Padmanaban. Theis found the studies to be important, interesting, and he recognized that the LTCCS had implications for his safety analysis at Long Haul. J.A. 0369, Addendum at 12.

Theis acknowledged that Long Haul's "Safety Statement" was a fair and appropriate safety policy for the company. J.A. 0363-0368, Addendum at 12. The Safety Statement was in place since before Theis's employment with Long Haul. Long Haul's Safety Statement refers to "accident traps," and Theis acknowledged under oath there is an increased risk of danger for what the TIFA and LTCCS studies refer to as "rear striking" collisions if a driver has to stop on an interstate due to a blockage of traffic. *Id.*

Theis also admitted that the risk of danger for rear striking collisions tends to move down the line as each successive driver stops, although "the longer the backup is the less chances there is because there is more warning devices…" J.A. 0369-71, Addendum at 12. Traffic flow interruption from a previous crash is a recognized associated factor with large truck crashes. J.A. 0359-70, Addendum at 12.

Appellate Case: 14-2981    Page: 33    Date Filed: 10/17/2014 Entry ID: 4207311

3. *Plaintiffs' Experts Provided A Statistical Analysis Demonstrating That Follow-Along Collisions Are Not Only Foreseeable, But Are Among The Most Common Causes Of Truck Related Fatalities.*

Plaintiffs' primary foreseeability expert is Jeya Padmanaban, M.S. She is an internationally recognized expert on truck safety and truck accident statistics. J.A. 0739-745. Ms. Padmanaban is a statistician with over 30 years of experience in performing automotive safety research and reviewing consumer complaint data, customer complaint data, warranty data, and field accident and injury data collected by U.S. Government and state agencies.

Ms. Padmanaban's findings and conclusions are unrebutted in the case. She reported that 28% of all heavy truck crashes are associated with traffic flow interruption, including a prior collision or congestion on the roadway and that 17% of fatal crashes and 21% of serious injury crashes are associated with traffic flow interruption, including a prior collision or congestion on the roadway. She also determined that the Nebraska data showed a large proportion of rear-end striking accidents.

25

Ms. Padmanaban found that these statistical resources were a basis to conclude that "rear impact crashes associated with interrupted traffic flow due to a previous crash are foreseeable, frequent events and vehicles stopped in traffic are a proximate cause and result of a significant number of rear impact collisions."

Ms. Padmanaban concluded:

> The happening of this second collision [Slezak/Schmidts] was the direct consequence of the primary collision (Mr. Johnson and Mr. Zhukov) which resulted in a road block of stopped traffic on a travel lane on an interstate highway. The second collision was a foreseeable and proximate result of the traffic flow interruption due to the first primary collision. My examination of field data on truck fatalities shows that the collisions Mr. and Mrs. Schmidt experienced occurred due to a natural and continuous sequence of an interrupted traffic flow and traffic flow interruption due to "stopped traffic from previous crash or other factors" is one of the leading factors associated with truck-related fatalities.
> J.A. 0745.

Plaintiffs' engineering expert Ben Railsback, P.E. , approached the question based on traffic engineering studies:

> Published research has established various definitions of secondary collisions (or accidents) in relation to a primary collision/incident (or accident)...[A]n accident should be considered a secondary accident based on several factors. The

26

factors include proximity to the primary accident both in distance and time. Other conditions included whether the secondary collision occurs upstream or downstream from the primary collision, and whether the collision occurred at the boundary of the high density queue of traffic that formed from the initial incident. Raub[4] states that secondary accidents occur within 15 minutes plus clearance time of the primary accident and within approximately 1 mile from the primary accident. Moore[5] further defines secondary accidents as being caused by the creation and existence of a traffic queue and occurring at the boundary of a high density queue of traffic. Moore describes the boundary of the high density queue as a "shockwave" extending from the site of the primary accident, and that the secondary collision occurs at the end of the shockwave. Moore also limits the secondary accidents to those accidents occurring within 2 hours or 2 miles from the primary incident or accident.

In traffic engineering terminology, the Zhukov/Johnson vehicle collision is the primary accident/collision because the accident resulted in a queue of vehicles being forming behind it. The Slezak/Schmidt/Wiener vehicle collision is a secondary accident/collision because it occurred at the boundary (or leading edge of the shockwave) of the vehicle queue. Further, the primary and secondary collisions occurred within 36 minutes and 4585 feet of each other, which are within the

---

[4] Raub, R.A., "Occurrence of Secondary Crashes on Urban Arterial Roadways," Transportation Research Record 1581, 1997, pp. 53-58; Raub, R.A., "Secondary crashes: An Important Component of Roadway Incident Management"Transportation Quarterly, Vol. 51, No. 3, 1997, pp. 93-104
[5] Moore, J. E., G. Giuliano, and S. Cho, "Secondary Accident Rates on Los Angeles Freeways," 41 Journal of Transportation Engineering, Vol. 130, No. 3, 2004, pp. 280–285.

Appellate Case: 14-2981     Page: 36     Date Filed: 10/17/2014 Entry ID: 4207311

defined limits of proximity of primary and secondary collisions. Therefore, the Zhukov/Johnson vehicle collision and the Slezak/Schmidt/Wiener vehicle collision are considered primary/secondary collision pairs.
J.A. 0781

Railsback's conclusions are based upon the traffic engineering standards for relational time and distance parameters as between the primary and secondary collision (which is always a rear striking collision). The Schmidts' collision falls within any of the published parameters which are: 1 mile/15 minutes plus clearance time; or, 2 hours/2 miles. J.A. 0766-0767.

Based on the admissible scientific evidence based on traffic engineering, the Zhukov/Long Haul and Slezak/Schmidt collisions are related and the secondary collision with an inattentive driver was foreseeable.

C.   PROCEDURAL HISTORY

After opening administrative estates in California, the plaintiffs filed their Complaint and Jury Demand in the United States District Court for the District of Nebraska on October 29, 2012. They alleged wrongful death,

28

survival actions, and wrongful death of an unborn child, Neb. Rev. Stat. §§ 30-809; 25-1401. J.A. 0073-94.

Defendants answered. J.A. 0020 (Long Haul); 0063 (AKI/Slezak); 0095 (Zhukov defendants). Fact and expert disclosures were made and discovery was completed. In accord with the district court's Order for Progression (J.A. 0013, Doc. 104) Long Haul and the Zhukov Defendants filed their motions for summary judgment on February 14, 2014. AKI and Slezak filed a Rule 56 motion relating to joint and several liability. J.A. 0014-15.

Plaintiffs timely responded. J.A. 0016-17. On May 21, 2014, the district court entered the Memorandum and Order which is the subject of this appeal. Doc. # 147, J.A. 1341-50, Addendum at 1. Following the plaintiffs settlement with AKI and Slezak, the trial court entered a final judgment on August 6, 2014.  Doc. #151

D.    RULING PRESENTED FOR REVIEW

In its Memorandum and Order, the trial court found that the co-defendant Slezak's actions were an efficient intervening cause under

29

Nebraska law. "Slezak's actions were extraordinary and could not have been anticipated by Defendants….No reasonable juror could conclude otherwise." J.A. 1346, 1350. At the heart of the trial court's findings of fact is the conclusion "as a matter of law, that Defendants' alleged negligence was not the proximate cause of Plaintiffs' injuries. Consequently the court need not, and will not directly address the issues of duty and breach in this Order." J.A. 1344. The trial court held that its orders rendered moot both Slezak's Rule 56 motion and plaintiffs' Motion To Amend. J.A. 1350.

## VII.   SUMMARY OF THE ARGUMENT

The trial court dismissed plaintiffs' claims against the defendants, holding that the negligence of Slezak was so extraordinary as to be an efficient intervening cause as a matter of law. This was error. There were facts of record from which a reasonable juror could conclude that *these defendants* could or should have anticipated precisely the type of conduct in which Slezak engaged, and the risk of injury at which they placed those stopped on I-80.

Appellate Case: 14-2981     Page: 39     Date Filed: 10/17/2014 Entry ID: 4207311

Under Nebraska law, "[f]oreseeability as it impacts duty determinations refers to 'the knowledge of the risk of injury to be apprehended. The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care...'" *Fuhrman v. State*, 265 Neb. 176, 655 N.W.2d 866, (Neb., January 24, 2003). Between the statistical analyses with which the Long Haul safety director was familiar, and Zhukov's own appreciation of "Danger! Danger! Danger!," as well as the additional facts discussed above there is ample evidence that these defendants knew that by blocking traffic, they were putting oncoming vehicles at risk for rear-end striking collisions.

## VIII. ARGUMENT

A. THE STANDARD OF REVIEW IS *DE NOVO*.

This Court reviews the trial court's grant of summary judgment *de novo*, applying the same standard as applied below. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997). A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine

Appellate Case: 14-2981    Page: 40    Date Filed: 10/17/2014 Entry ID: 4207311

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see generally Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir.1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also, Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir.1992). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587(1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir.1984), *cert. denied*, 470 U.S. 1057 (1985).

B.    THE TRIAL COURT INCORRECTLY DECIDED THAT THE DEFENDANTS' ACTIONS, AS A MATTER OF LAW, DID NOT PROXIMATELY CAUSE THE DEATHS OF THE SCHMIDT FAMILY.

    1.    *To Properly Analyze The Claims Made By The Plaintiffs, The Court Must Consider The Foreseeability Of The Harms Suffered By The Schmidt Family As A Result Of The Actions Of The Defendants.*

The trial court's decision was based entirely on proximate cause. It

did not consider the issues of duty or breach in its Order:

> Having carefully considered the matter, the Court concludes, as a matter of law, that Defendants' alleged negligence was not the proximate cause of Plaintiffs' injuries. Consequently, the Court need not, and will not, directly address the issues of duty and breach in this Order.
> J.A. 1345.

To establish proximate cause, a plaintiff must meet three basic

requirements: (1) without the negligent action, the injury would not have

occurred, commonly known as the "but for" rule; (2) the injury was a

natural and probable result of the negligence; and (3) there was no efficient

intervening cause. *Latzel v. Bartek*, 288 Neb. 1, 846 N.W.2d 153, 163 (2014).

An efficient intervening cause breaks the causal connection between

the original conduct and the injury when: (1) the negligent actions of a

33

third party intervene; (2) the third party had full control of the situation; (3) *the third party's negligence could not have been anticipated by the defendant*; and (4) the third party's negligence directly resulted in injury to the plaintiff. *Id.* at 164 (emphasis added). The doctrine that an intervening act cuts off a tortfeasor's liability comes into play only when the intervening cause is not foreseeable *to the defendant*. *Id.* "[I]f a third party's negligence is reasonably foreseeable, then the third party's negligence is not an efficient intervening cause as a matter of law." *Id.* (citation omitted.)

How is the Court to measure foreseeability? "[I]f the likelihood of the intervening act was one of the hazards that made defendant's conduct negligent – that is, if it was sufficiently foreseeable to have this effect – than defendant will generally be liable for the consequences." *Sacco v. Carothers*, 253 Neb. 9, 15, 567 N.W.2d 299, 304 (1997).

"The extent of foreseeable risk depends on the specific facts of the case and cannot be usefully assessed for a category of cases; *small changes in the facts may make a dramatic change in how much risk is foreseeable.* Thus… courts should leave such determinations to juries unless no reasonable

34

person could differ on the matter." *A.W.*, 784 N.W.2d at 917; *Latzel*, 846

N.W.2d at 165 (quoting Restatement (Third) of Torts: Phys. & Emot. Harm

§ 7 (2010) (comment j)).

> 2.   *Whether or not the harms suffered by the Schmidt Family were foreseeable to these Defendants is a question for the jury.*

Very recently, in *Reed v. State*, 2014 WL 2581349 (Neb. App. June 10,

2014), the Court of Appeals of Nebraska stated, "[t]he question of

proximate cause, in the face of conflicting evidence, is ordinarily one for

the trier of fact."

In *Heatherly v. Alexander*, 421 F.3d 638 (8th Cir. 2005), this Court

determined that in accord with Nebraska precedent, and in conflict with

the trial court's holding in this case, the question of causation was for the

jury to decide. *Id.* at 649. In *Heatherly*, a motorist, individually and as the

administrator of his wife's estate, sued a trucking company and its

employee for injuries they suffered when a separate truck, which had been

stolen, crashed into the rear of their vehicle at 90 miles per hour, and forced

it into the trucking company's vehicle which was parked in the emergency

lane leading into a rest area.

35

This Court decided in *Heatherly* that "there was sufficient evidence to create a jury question regarding causation." *Id.* at 644. Since the *Heatherly* decision, the Supreme Court of Nebraska in *A.W.* made clear that foreseeability is always a question for the trier of fact unless no reasonable person could differ.

The Supreme Court of Nebraska has explicitly defined the roles for the court and the trier of fact in determining whether there is a legal duty and whether there is a breach of that duty. In *A.W.*, the court explained that rules about duties "are meant to serve as broadly applicable guidelines for public behavior, i.e., rules of law applicable to a category of cases," as distinguished from foreseeability determinations which "are fact specific, so they are not categorically applicable, and are incapable of serving as useful behavioral guidelines." 784 N.W.2d at 914-15.

The court explained that prior to the *A.W.* decision it had treated the foreseeability of a particular injury as a question of law. *Id.* at 914. The Supreme Court of Nebraska felt that this put courts "in the peculiar position … of deciding questions, as a matter of law, that are uniquely

36

rooted in the facts and circumstances of a particular case and in the

reasonability of the defendant's response to those facts and circumstances."

*Id.* To correct this problem, the Supreme Court of Nebraska explicitly

adopted the duty analysis contained in the Restatement (Third) of Torts, § 7

and expressly held that "foreseeability is not a factor to be considered by

courts when making determinations of duty." *Id.* at 918. The court

supported its finding with the following reasoning:

> The Restatement (Third) explains that because the extent of
> foreseeable risk depends on the specific facts of the case, courts
> should leave such determinations to the trier of fact unless no
> reasonable person could differ on the matter. Indeed,
> foreseeability determinations are particularly fact dependent
> and case specific, representing "a [factual] judgment about a
> course of events ... that one often makes outside any legal
> context." So, by incorporating foreseeability into the analysis of
> duty, a court transforms a factual question into a legal issue
> and expands the authority of judges at the expense of juries or
> triers of fact.
> *Id.* at 914 (citations omitted.)

The court concluded that the reasoning of the Restatement (Third)

was persuasive because:

> In order to determine whether appropriate care was exercised,
> the fact finder must assess the foreseeable risk at the time of the
> defendant's alleged negligence. The extent of foreseeable risk

Appellate Case: 14-2981    Page: 46    Date Filed: 10/17/2014 Entry ID: 4207311

depends on the specific facts of the case and cannot be usefully assessed for a category of cases; *small changes in the facts may make a dramatic change in how much risk is foreseeable*. Thus, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter. And if the court takes the question of negligence away from the trier of fact because reasonable minds could not differ about whether an actor exercised reasonable care (for example, because the injury was not reasonably foreseeable), then the court's decision merely reflects the one-sidedness of the facts bearing on negligence and should not be misrepresented or misunderstood as involving exemption from the ordinary duty of reasonable care.

*Id.* at 917 (emphasis added).

The court further justified:

. . . placing foreseeability in the context of breach, rather than duty, properly charges the trier of fact with determining whether a particular harm was, on the facts of the case, reasonably foreseeable—although the court reserves the right to determine that the defendant did not breach its duty of reasonable care, as a matter of law, where reasonable people could not disagree about the unforeseeability of the injury. We have often said that "[t]he risk reasonably to be perceived defines the duty to be obeyed [,]" but that proposition should now be understood as explaining how foreseeability helps define what conduct the standard of care requires under the circumstances and whether the conduct of the alleged tort-feasor conforms to that standard. These are determinations reserved for the finder of fact.

*Id.* at 918 (citations omitted.)

38

In this case there was evidence from which reasonable jurors could conclude that Zhukov and Long Haul could easily foresee that their own negligence would be duplicated and would endanger oncoming traffic. Based on the Zhukov defendants' own admissions of "Danger," and "a big threat," a juror could conclude that it was inevitable that someone would be rear-ended as traffic was being brought to a stop. In fact another driver, negligent not unlike Johnson or Zhukov, unable to speak English, driving in violation of safety regulations appeared just like they should have expected. Only, the Schmidt family paid the price.

      3.    *The Trial Court Ignored The Facts Which Establish That The Harms Suffered By The Schmidt Family Were Proximately Caused By The Negligence Of The Defendants.*

          a.    Because the risk of a rear-striking collision was precisely the hazard caused by these defendants' negligence, they should be liable for the consequences.

Practically speaking, the trial court ignored the particular facts of this case as they pertain to the Zhukov Defendants and Defendant Long Haul.

Appellate Case: 14-2981    Page: 48    Date Filed: 10/17/2014 Entry ID: 4207311

Zhukov's own apprehension of "Danger! Danger! Danger!" was stated in his broken English/Russian at his deposition.[6] J.A. 0568, Addendum at 20. The President of MTR Express, Inc. admitted a disabled truck creates a "threat" of harm. J.A. 0926 ("It's a big threat… it's always a big danger for the drivers.")

The risk of an inattentive driver crashing into a stopped car on a rural interstate was as real to the Schmidt Family as it was evident to Mr. Mayes. The only difference is that it is undisputed that the Schmidt Family was "stopped on the interstate -- no fault of their own." J.A. 0641, Addendum at 21.

A jury could conclude that Zhukov negligently failed to pull over once he began to lose air pressure.[7] He heard the air lines rupture. An alarm began buzzing in the cab. The experts indicate he had plenty of time to get his rig fully on to the shoulder. J.A. 0769-77. The testimony of law

[6] Video footage of the deposition excerpt may be viewed at http://tinyurl.com/mnqkcg3 .  A video link was provided to the trial court. J.A. 833.  The web address has been shortened to that referenced here.
[7] Records show that MTR Express, Inc. had a series of violations for "brake, tubing, and hosing adequacy". J.A. 0955.

Appellate Case: 14-2981    Page: 49    Date Filed: 10/17/2014 Entry ID: 4207311

enforcement officers, expert witnesses, and exhibits clearly support a claim of negligence against Zhukov for negligently placing his reflective triangles in positions which guided the Long Haul truck into, instead of away from, Zhukov's disabled truck. *Id.* Zhukov's lack of ability to speak sufficient English made him unable to read or understand the owner's manual for his truck, which included instructions on how to overpower his brakes and get his rig completely off the road. His insufficient English prohibited him from making a 911 call.

All of these were violations of the FMCSA regulations. J.A. 0946, 0957. Zhukov's violations of FMCSA regulations could lead a jury to conclude that the violation of other FMCSA regulations by another driver – Slezak – would be readily foreseeable.

Keith Johnson crashed the Long Haul tractor-trailer he was driving full-speed into Zhukov's tractor-trailer. J.A. 0473, Addendum at 16. After investigating the scene, Deputy Goodrich reported, that there were not any skid marks "that would indicate that brakes were used" by Mr. Johnson. J.A. 1322, 1327-1336.

41

A jury could find from the facts in the record that Johnson was negligent in not seeing the Zhukov tractor-trailer displaying its emergency blinkers and triangles placed behind the tractor-trailer. A jury could find that Johnson's negligence was indistinguishable from that of Slezak when he crashed into the Schmidt Family. Based on that, a jury could conclude from all of the evidence that Slezak's negligence would be foreseeable to Long Haul.

Mark Theis, the safety director for Long Haul, testified that even if the truck is off the road and on the shoulder "somebody not paying attention could swerve into the shoulder of your lane that you're in… If you're parked in the lane of traffic you become a higher risk than if you're fully on the shoulder." J.A. 0371, Addendum at 12. Theis agreed that even with a line of stopped traffic there is an increased risk of danger for rear-end accidents. J.A. 0367.

According to Trooper Wallace, Slezak's vehicle crashed into the Schmidt Family before emergency personnel had closed down the highway and diverted traffic because of the Zhukov/Long Haul collision. J.A. 0641,

Appellate Case: 14-2981    Page: 51    Date Filed: 10/17/2014 Entry ID: 4207311

Addendum at 21. This same Trooper described the Zhukov/Long Haul collision as an "indirect contributing cause" of the deaths of the Schmidt Family. If the initial wreck had not happened, the flow of traffic would have been normal and the "stoppage would not have occurred." J.A. 0651, Addendum at 21.

Deputy Wiedeburg explained in his deposition, "if it had not been for the Zhukov accident, the Schmidt accident would not have occurred." J.A. 0600-01. Wiedeburg added that the Schmidts deaths occurred because they were stopped. J.A. 1150, Addendum at 23.

Dr. Schilke concluded that each member of the Schmidt Family was killed by a high energy collision resulting from a tractor-trailer traveling at highway speed hitting their *stopped* cars. J.A. 1057. Were it not for the negligence of the defendants, the Schmidts would not have been stopped, and placed in the hazardous conditions known to these defendants to exist when traffic flow is interrupted.

The defendants cannot be heard to argue that Slezak's conduct was unforeseeable when Slezak's conduct was tantamount to the negligence

43

committed by the defendants in the first place. "Clearly, a defendant

cannot be relieved from liability for his or her negligence by the fact that

the very harm from which the defendant has failed to protect the plaintiff

has occurred. An action that was foreseeably within the scope of the risk

occasioned by the defendant's negligence cannot be said to supersede that

negligence." *Sacco*, 567 N.W.2d at 304.

> b.    Expert testimony established that traffic flow interruptions including prior collisions is a leading cause of serious/fatal crashes such as the ones which combined to kill the Schmidt Family.

Experts in the case gave scientific confirmation and logic to the real

life experienceof Gary Mayes, as well as the fright  expressed by Zhukov

for "danger," and the common sense opinions of the law enforcement

officers.

Truck safety statistician Jeya Padmanaban reported that 28% of all

heavy truck crashes are associated with traffic flow interruption, including

a prior collision or congestion on the roadway. Moreover, 17% of fatal

crashes and 21% of serious injury crashes are associated with traffic flow

interruption, including a prior collision or congestion on the roadway. She

44

affirmed that data from Nebraska specifically showed a large proportion of rear-end collisions. She concluded that the Slezak/Schmidt Family collision "was a foreseeable and proximate result of the traffic flow interruption due to the first primary collision." J.A. 0744-45.

Defendant Long Haul's own safety officer, Mark Theis, bolsters Ms. Padmanaban. He stated that he was familiar with the FMCSA studies which established this and that they were accurate. J.A. 0368, Addendum at 12. Mr. Theis referred to the LTCCS. He noted that the study was reliable. He agreed that the LTCCS had implications for safety analysis and making safety decisions as the Safety Director of Long Haul. J.A. 0369, Addendum at 12. Moreover, Long Haul's own Safety Statement referred to traffic backups as accident traps. J.A. 0367.

The traffic engineering literature also supports the causal relationship between what is known in the field as the "primary" and "secondary collisions." The plaintiffs' engineer, Ben Railsback, P.E., noted the factors of proximity to the primary accident in distance, direction, and time that establish a "direct link between the primary collision between the

45

Zhukov/Johnson vehicles and the subsequent secondary collisions involving the Slezak/Schmidt … vehicles." J.A. 0781. Research establishes relational and distance parameters between primary and secondary collisions. The secondary collision in which the Schmidt Family was killed did fall within the published parameters for the risk of a secondary collision. J.A. 0766-67.

Ted Sokol, Ph. D., P.E. and Steve Sokol, P.E., J.D. are defendant Zhukov's engineering experts. They correlate the passage of time to the number of vehicles passing Zhukov's stalled rig. J.A. 1201. In the period of time from when Zhukov stalled to the time of the Zhukov/Long Haul collision, *an estimated 24 vehicles* passed Zhukov. If we use the Sokols' statistics, one could conclude that within 26 vehicles (in fifteen minutes) two drivers (Zhukov and Johnson) were negligent. It follows from the Sokols' logic that it would be inevitable and therefore absolutely foreseeable to Zhukov and Long Haul that another inattentive driver would come along in the next 36 minutes. J.A. 1202.

46

The trial court made no reference to or analysis of the plaintiffs expert witnesses. Each expert provides generally accepted scientific information which provided context for a jury to analyze foreseeability.

    c.    The trial court erred by not following this Court's decision in *Heatherly.*

In *Heatherly*, this Court performed an in-depth analysis of the state of the law as it pertained to proximate cause in Nebraska , and found that there was sufficient evidence to create a jury question over causation given the following evidence:

- an expert in over-the-road trucking testified that the defendant's truck was parked in an unsafe location where truckers were trained not to park, and that truckers should park at truck stops away from traffic;

- a Nebraska State Trooper testified that most high-speed traffic travels in the right lane which is adjacent to the emergency lane where the truck was parked, that the truck was not at all parked within the confines of the rest area, that the emergency lane was not designed for truckers to stop and rest there, and that the truck was illegally parked in an unsafe location;

- an engineer specializing in accident reconstruction testified that if the truck had not been parked there the plaintiffs' motor home would have ended up in a grassy area beyond the shoulder of the emergency lane, and that

47

> the impact between the motor home and the truck was like hitting a wall. It was the unique position in which the passenger car found itself that was a cause of the injuries. *Id.* at 644-645.

The facts in this case are hauntingly similar to those in *Heatherly*. If anything, the facts in this case are an easier call for the Court. The negligence of Slezak was less egregious than the co-defendant , Mr. Alexander, in *Heatherly.* Slezak was not driving a stolen vehicle 90 miles per hour down a highway, he was merely fatigued and inattentive. The *Heatherly* case involved intentional wrongdoing by the secondary colliding vehicle, yet, this Court still found that proximate cause was an issue for the jury to determine. This Court did not focus on the criminal conduct of Alexander. To the contrary, the Court focused on the hazard presented by Gilbertson's semi-trailer parked on the exit ramp. The nature of Slezak's actions are irrelevant to the question of whether Zhukov and Long Haul appreciated the hazard they created. "The law does not require precision in foreseeing the exact hazard or consequence which happens. It is sufficient if what occurs is one of the kind of consequences which might reasonably

48

be foreseen." *Heatherly*, 471 F.3d at 641 (quoting *Brown v. Neb. Pub. Power Dist.*, 209 Neb. 61, 306 N.W.2d 167, 171 (1981)).

In *Heatherly*, the "primary" actor's truck was completely off the highway; certainly a rear-end striking collision is foreseeable to Zhukov and Johnson, whose negligence completely blocked WB I-80.

In *Heatherly*, this Court held that "the jury should have been permitted to consider the evidence presented and determine from it whether the Heatherly's injuries reasonably flowed, *at least in part*, from [the trucker's] negligent parking of the [truck] on the shoulder of the ramp." *Heatherly*, 421 F.3d at 644 (emphasis added). For the same reasons, the jury in the case at hand should be allowed to consider the evidence presented and determine whether the Schmidt Family's demise reasonably flowed, *at least in part*, from having been stopped in traffic due to the negligence of the Zhukov Defendants.

In the decision below, the trial court simply did not take any of this evidence into consideration, but nonetheless determined as a matter of law that Slezak's actions were an efficient intervening cause. Where the

49

*Heatherly* court deferred to the expert evidence and sent the case to the jury, the trial court here inserted its own judgment that "no reasonable juror could find otherwise."

> 4. *Recent decisions from the Supreme Court of Nebraska establish that when the harm is within the scope of the risks created by the negligent actions of a person proximate cause is a decision for the jury.*

Since *Heatherly*, multiple decisions of the Supreme Court of Nebraska have strengthened Nebraska's preference for having juries make determinations regarding foreseeability. When harm caused is within the scope of the risks created by the negligent actions of a person, Nebraska law requires foreseeability to be submitted to a jury. A review of these cases shows how important the particular facts of each case are to the foreseeability determination. As the court said in *A.W.,* "small changes in the facts may make a dramatic change in how much risk is foreseeable. Thus, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter." 784 N.W.2d at 917. In this case, the trial court ignored the expert testimony and the testimony of

Appellate Case: 14-2981    Page: 59    Date Filed: 10/17/2014 Entry ID: 4207311

officers and witnesses at the scene. This was a reversible error by the trial court.

In *A.W.*, the mother of an elementary school student who was sexually assaulted in a school restroom during the school day by an intruder brought a negligence action against the school district. The court found that this was not a case in which a substantial number of similar incidents have occurred on the premises nor was the school district on notice of the behavior of this particular assailant. The court explained, "[i]n order to make a risk of attack foreseeable, the circumstances to be considered must have a direct relationship to the harm incurred, and that relationship is lacking here." *A.W.*, 784 N.W.2d at 920.

The court did find that once the assailant entered the building "reasonable minds could differ as to whether [the school district's] failure to note his presence, and response to his presence, satisfied its duty of reasonable care." *Id.* The court thus held that the plaintiff was entitled to a full trial to resolve the issue. *Id.*

Appellate Case: 14-2981    Page: 60    Date Filed: 10/17/2014 Entry ID: 4207311

Once the assailant was in the building, an attack on a student was within the scope of the foreseeable risks. Similarly, once vehicles were forced to stop for the Zhukov/Long Haul collision, the risk of being hit from behind by another inattentive driver was within the scope of risks which were foreseeable to these defendants.

In *Deviney v. Union Pacific R. Co.*, 280 Neb. 450, 786 N.W.2d 902 (2010), a conductor sued a railroad under the Federal Employers' Liability Act (FELA) for injuries she received from the West Nile Virus during the course of her employment. The appeal was considered by the Supreme Court of Nebraska after its decision in *A.W.* The court found that the railroad's legal duty was well established under FELA but that whether the railroad breached that duty and whether the conductor's injuries were foreseeable was a question of fact. *Id.* at 907. The court found that the conductor presented evidence that the railroad knew or should have known of the potential hazard caused by the presence of mosquitos in the trainyard and that the railroad failed to exercise reasonable care to inform and protect the

52

conductor from that hazard and thus her claim should have survived a motion for summary judgment. *Id.* at 908-909.

In this case, plaintiffs have presented plenty of evidence that the defendants knew or should have known of the potential hazard caused by blocking a rural interstate, thus creating a question for the jury.

In *Riggs v. Nickel*, 281 Neb. 249, 796 N.W.2d 181, 188 (2011), a mechanic brought an action against a landowner, seeking damages for injuries the mechanic suffered while repairing a motor grader (for which the landowner had left the ignition switch on) which a neighbor had stored on the landowner's property. The Supreme Court of Nebraska found that no reasonable fact finder could conclude that a landowner breached his duty of care with respect to a mechanic on his property simply by leaving the ignition switch of the grader on. The court held that the landowner had a duty to exercise reasonable care but even with the switch on, the grader was not running and posed no immediate threat to the mechanic. *Id.* at 188. The court also recognized that the landowner had very limited experience with the grader, thus reinforcing the doctrine that the question of

53

foreseeability should be viewed from the perspective of the primarily negligent defendant. Here, Zhukov and Long Haul had professional experience and training in highway safety, and knew specifically of the risk they posed.

In *Martensen v. Rejda Bros., Inc.*, 283 Neb. 279, 808 N.W.2d 855 (2012), an employee was injured when an all-terrain vehicle overturned and pinned his leg while he was repairing fences on his employer's ranch. The employee sued his employer for failing to make a timely effort to search for, discover, and rescue him. The court found that the employer did have a duty of reasonable care to the employee. *Id.* at 863. The court reaffirmed the holding in *A.W.* that "foreseeability" determinations are fact specific and noted that "determinations of actual 'knowledge' are also fact specific." *Id.* The court found that the trial court correctly allowed the jury to make fact determinations regarding the employer's knowledge. *Id.*

In *Fuhrman v. State*, 265 Neb. 176, 655 N.W.2d 866 (2003), after being assaulted by a patient, a worker sued the state for not disclosing to the in-patient care center the patient's long documented history of violence. The

54

state defended the suit by claiming that the actions of the facility were an efficient intervening cause of the harm suffered by the worker. The state claimed that the facility's actions and knowledge of the patient's assaultive behavior were efficient intervening causes superseding the state's negligent conduct. *Id.* at 876.

The Supreme Court of Nebraska disagreed, finding that without the state's disclosure of information regarding the patient's severe and extensive history of attacking his caregivers (his three criminal convictions for assault and his tendency to target female caregivers) the facility had insufficient knowledge of the need to warn and train its workers as to how to respond to the patient. *Id.* The Supreme Court of Nebraska found that given the state's failure to disclose the patient's history to his caregivers and the facility's alleged failure to warn and train staff, that the facility's actions were not an independent act which broke the causal connection between state's negligence and the worker's injuries. *Id.*

Essentially, the Supreme Court of Nebraska held that where the secondary act of negligence is the same as the primary, the secondary

55

negligence cannot be an efficient intervening cause. The court came to this decision because it found that the harm suffered by the worker was within the scope of the risks created by the state's failure to disclose. The court explained that a defendant cannot be relieved from liability for his or her negligence by the fact that the very harm from which the defendant has failed to protect the plaintiff has occurred. *Fuhrman*, at 876 (quoting *Sacco*, 567 N.W.2d at 304.) "[I]f the likelihood of the intervening act was one of the hazards that made defendant's conduct negligent – that is, if it was sufficiently foreseeable to have this effect – then defendant will generally be liable for the consequences." *Sacco*, 567 N.W.2d at 304.

In *Sacco v. Carothers*, a bar patron who was injured in fight with a fellow patron, which occurred outside the bar after bartender instructed patrons that if they did not "take it outside" she would call police, brought action against bar owner. The Supreme Court of Nebraska held that the conduct of fellow patron in fighting with patron was foreseeable result of claimed negligence of bar owner, and thus *was not an efficient intervening cause as a matter of law. Sacco*, 567 N.W.2d at 305. Similar to its proximate

Appellate Case: 14-2981    Page: 65    Date Filed: 10/17/2014 Entry ID: 4207311

cause decisions, the Supreme Court of Nebraska found that if the harm is within the scope of the risk created, the case is not appropriate for summary judgment.

In *Wilken v. City of Lexington*, 16 Neb. App. 817, 754 N.W.2d 616 (2008), a mother brought a negligence action against a city after her children were injured when a pickup truck they were riding in was shot at by a juvenile who was riding in a vehicle stolen by another juvenile who had escaped from custody of the city police department. In finding that there was an efficient intervening cause, the court explained, "[t]he act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created*, and that a third person might avail himself of the opportunity to commit such a tort or crime. *Wilken*, 754 N.W.2d at 623 (emphasis added).

57

5.     *The Blind Intersection Cases, Particularly* Latzel v. Bartek, *Are Inapposite.*

The trial court relied principally on *Latzel v. Bartek* and several similar "blind intersection" cases: *Zeller v. Howard County*, 227 Neb. 667, 419 N.W.2d 654 Neb.,1988, *Willet v. County of Lancaster*, 271 Neb. 570, 713 N.W.2d 483 Neb.,2006 and *Delaware, By and Through Delaware v. Valls*, 226 Neb. 140, 409 N.W.2d 621 Neb.,1987. These cases are all distinguishable on their facts – each is brought against a landowner for the condition of their property, rather than against a driver.

In *Latzel*, the personal representative of a passenger's estate brought an action against the owners of property adjoining the southwest corner of an uncontrolled intersection of rural county roads, where a catastrophic collision took place between a motorist and another driver. The plaintiff alleged that the property owners had negligently grown corn up to the ditch near the intersection, thereby obstructing the view for traffic. In considering whether the injuries to the passenger were foreseeable to the landowners, the court cited the Restatement (Third) of Torts, § 34 which notes that "an actor's liability is limited to those harms that result from the

58

risks that made the actor's conduct tortuous." *Id.* 846 N.W.2d at 166. The court explained that this was "sometimes referred to as 'scope-of-risk' analysis." *Id.*

In *Latzel*, it is clear that the court did not consider highway traffic within the scope of the risks involved in growing corn on property. In contrast, here the actions of the defendants created precisely the risk of harm that occurred to the Schmidt Family. Or, to put it another way, the harm to the Schmidt Family was within the scope of the risks created by the defendants.

*Latzel*, upon which the trial court relied, is distinguishable from this case. In *Latzel*, the court noted that the owners of the property had been raising corn in the same manner for 35 years and that there was nothing unusual about the practice of planting corn "up to the ditch." *Id.* at 169. One of the landowners testified that he was unaware of any other motor vehicle accidents at rural intersections abutting the farmland and that he was unaware of any such accidents at other county road intersections due to corn growing in an abutting field. *Id.* Additionally, the drivers involved

59

in the accident testified that there was nothing unusual about the rural

intersection at that time of year. *Id.* Another farmer from the same area

testified that there was nothing improper about the manner in which the

defendant landowners planted their corn and that it was consistent with

the manner in which he and other farmers in the county had plant corn. *Id.*

The *Latzel* court noted, "[t]here was no evidence that the landowners

could have reasonably foreseen the drivers' conduct." *Id.* at 167. Thus, the

court determined that reasonable minds could not disagree as to whether

the drivers' actions could have been anticipated by the landowners; and,

the drivers' negligence was an intervening cause of the collision which

severed the causal connection between the landowners' conduct and the

passenger's injuries. *Id.*

The appellate review in *Zeller v. Howard Cnty.*, 227 Neb. 667, 419

N.W.2d 654 (1988) followed a full bench trial. The appellate court cautioned

that it was not its prerogative to re-weigh the evidence. *Id.* at 669.

In *Willet v. Cnty. of Lancaster*, 271 Neb. 570, 713 N.W.2d 483 (2006) a

berm at the NE corner of the intersection blocked the vision of both SB and

60

WB drivers approaching the intersecting traffic. The berm had been constructed by a private party. Plaintiffs contended that the berm should have been knocked down by the county to allow visibility. The court held that the county could not have anticipated the negligence of a driver running a stop sign.

In this case, we contend that Zhukov and Johnson/Long Haul could certainly anticipate, from their own negligent conduct, that other drivers would be equally negligent. Johnson failed to brake, was inattentive, and failed to see the Zhukov truck sitting ahead with its hazard lights flashing. This is indistinguishable from Slezak's conduct.

In *Delaware, By & Through Delaware v. Valls*, 226 Neb. 140, 409 N.W.2d 621 (1987), the court held that the negligence of a motorcycle driver in pulling out into intersection and of an automobile driver in driving into a motorcycle, injuring passenger, were efficient intervening causes, relieving property owners of liability for growing, maintaining, and failing to trim vegetation.

61

The defendants here cannot claim that the actions of Slezak were unforeseeable when Slezak's wrongdoing is indistinguishable from that of Long Haul (inattentive) and clearly similar to that of Zhukov (careless and in breach of FMSCA safety standards with regard to his placement of triangles – to prevent rear-end accidents the very risk which occurred and blocked the highway). These defendants were not growing corn or tending to shrubbery. They, like the truck driver who crashed into the Schmidt Family, were truckers. They were very much aware of the dangers their actions posed to other drivers on the highway. There is plenty of evidence for a jury to make this conclusion.

A bartender knows the risks created by simply sending two people who are fighting in a bar outside. A government entity knows the risks involved in not disclosing to a mental health facility the violent criminal background of an individual committed to the facility Licensed commercial truckers, truck owners and carriers are fully aware of the hazards of blocking a rural highway especially if their own negligence creates a risk of harm if only their own negligence is merely to be duplicated.

The harms suffered by the Schmidt Family in being killed in a rear-ended collision because they were trapped by blocked traffic and vulnerable to another negligent truck were directly within the forseeable risks created by the defendants.

## IX.    CONCLUSION

Though *Heatherly* was decided before *A.W.,* its holding is still persuasive given that it ultimately found that the foreseeability issue in that case was for the jury. After the *A.W.* decision, the view of the Supreme Court of Nebraska as it pertains to whether or not foreseeability is a jury decision is even clearer. Now, it is established that foreseeability is a jury question. *A.W.*, 784 N.W.2d at 921. Nothing in the decisions of the Supreme Court of Nebraska since *A.W.* changes that calculation at all. It is clear today that *Heatherly* was correctly decided under Nebraska law.

In *Heatherly*, this Court's evaluation of Nebraska law on the foreseeability determination remains important and relevant. As the review of Nebraska precedent since this Court's decision in *Heatherly* makes very clear, the Supreme Court of Nebraska has expanded the role of the trier of

63

fact in making determinations about proximate cause rather than constricting it. But, even under the cases decided before *A.W.*, decisions about the foreseeability of an intervening cause were determinations left for a jury.

The difference between the outcomes in cases like *Latzel*, *Riggs*, the blind intersection cases and the outcomes in *Heatherly*, *A.W.*, *Deviney*, and *Martensen* can be found in this Court's analysis in *Heatherly*. In *Heatherly*, this Court said, "when the original negligence is of a character…" which invites the subsequent cause, the intervening cause will not excuse it. *Heatherly*, 421 F.3d at 647. As referenced in *Latzel*, the Restatement (Third) of Torts, § 34 explains, "an actor's liability is limited to those harms that result from the risks that made the actor's conduct tortuous." *Latzel*, 846 N.W.2d at 166. The court explained that this was "sometimes referred to as 'scope-of-risk' analysis." *Id.* Or, as more succinctly explained in *A.W.*, "the circumstances to be considered must have a direct relationship to the harm incurred". *A.W.*, 784 N.W.2d at 920.

Appellate Case: 14-2981    Page: 73    Date Filed: 10/17/2014 Entry ID: 4207311

In this case, the collisions that occurred on the highway were very much within the scope of the risks created by the negligence of these defendants. These defendants were not growing corn on the side of the road.

The trial court erred when it took the case away from the jury. The factual determination of whether the Zhukov Defendants, as professional tractor-trailer operators, and particularly in view of their own negligent conduct, could have anticipated the negligence of Josef Slezak was a jury question.

The Appellants request the Court to reverse the dismissal of the Zhukov Defendants and Long Haul, and remand the case back to the District Court for trial.

Respectfully submitted,
/s/ *James H. Chalat*
James H. Chalat
CHALAT HATTEN KOUPAL & BANKER PC
1900 Grant St., Ste. 1050
Denver, Colorado 80203
Telephone: 303.861.1042
Fax: 303.861.0506
jchalat@chalatlaw.com
*ATTORNEY FOR PLAINTIFFS-APPELLANTS*

65

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document, including all headings, footnotes, and quotations, but excluding summary of the case, the table of contents, table of authorities, any addendum containing statutes, rules or regulations, and any certificates of counsel, contains 12,071 words, as determined by the word count of the word-processing software used to prepare this document, specifically Microsoft Word 2010 in Palatino Linotype 14 point font, which is no more than 14,000 words permitted under Fed.R.App.P. 32(a)(7)(B)(i).

Dated: October 17, 2014.

*/s/ James H. Chalat*
James H. Chalat

Appellate Case: 14-2981     Page: 75     Date Filed: 10/17/2014 Entry ID: 4207311

## CIRCUIT RULE 28A(h) CERTIFICATION

The undersigned hereby certifies that I have filed electronically, pursuant to Circuit Rule 28A(h), a version of the brief and addendum in non-scanned PDF format.  I hereby certify that the file has been scanned for viruses using VIPRE GFI Business Agent version 6.2.5530  and that it is virus-free.

/s/ *James H. Chalat*
James H. Chalat

Appellate Case: 14-2981     Page: 76     Date Filed: 10/17/2014 Entry ID: 4207311

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 17, 2014, an electronic copy of the Appellants' Brief was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. The undersigned also certifies that the following participants in this case are registered CM/ECF users and that service of the Brief will be accomplished by the CM/ECF system:

Stephen L. Ahl
Krista M. Carlson
Erin C. Duggan Pemberton
WOLFE & SNOWDEN
Suite 800, Wells Fargo Building
1248 O Street
Lincoln, NE 68508-1424

John P. Inserra
INSERRA & KELLEY
Suite 200
6790 Grover Street
Omaha, NE 68106

Michael B. Langford
R. Jay. Taylor, Jr.
SCOPELITIS & GARVIN
Suite 1500
1500 Market Tower
10 W. Market Street
Indianapolis, IN 46204

_/s/ James H. Chalat_
James H. Chalat

68